(563 P.2d 531)
No. 48,299

EQUITY INVESTORS, INC., a corporation, *Appellant,* v. AMMEST GROUP, INC., formerly AMMEST, INC., formerly LIBERTY INVESTORS, INC., a corporation, *Appellee.*

Petition for review denied June 15, 1977.

Opinion filed April 29, 1977.

*Lawrence McDonough* and *Emmet A. Blaes,* of Jochems, Sargent and Blaes, of Wichita, for the appellant.

*Paul B. Swartz* and *James A. Walker,* of Martin, Pringle, Schell and Fair, of Wichita, for the appellee.

Before FOTH, P.J., ABBOTT and PARKS, JJ.

FOTH, J.: This is an action for specific performance, or alternatively for damages for breach, of a written contract under which the plaintiff corporation agreed to sell all its assets to the defendant corporation in return for shares of defendant's stock. Trial was to the court, which rendered judgment for the defendant on a finding that the defendant's officers had not been properly authorized by its board of directors to execute the contract on its behalf.

The deficiency found was that only three of the defendant's six directors voted to authorize the contract, two voted against the contract, while one abstained. Plaintiff has appealed, contending that the vote was sufficient to authorize the contract, and that even if it was not defendant ratified the vote, clothed its officers with apparent authority to execute the contract, and is estopped to deny its validity.

Plaintiff Equity Investors, Inc., is a New Mexico real estate holding and operating company. In 1971 its assets consisted primarily of two motels and a nursing home worth around $4,000,000, subject to outstanding liabilities of around $2,300,000. Victor E. Katt was its president, chairman of the board, and controlling stockholder. The defendant, then known as Liberty Investors, Inc., was a Kansas holding company with real estate and insurance interests. In 1971 James Ford was the chairman of its board of directors and its chief executive officer.

In the spring of 1971 Katt was approached by Ford and by Ray

Hodge, another director of Liberty and former chairman of its board, to see if Katt was interested in selling Equity's assets. Katt's reaction was cautious, because prior negotiations along the same line in 1970 had been unproductive and Katt felt he had been "jacked around" by the Liberty group. In addition, Equity was having cash flow problems which would be aggravated by lengthy negotiations if they proved unfruitful. Katt was assured that Liberty was serious about the proposition and that a committee of its directors was updating its 1970 investigation of Equity's assets. On the strength of these assurances Katt entered into negotiations culminating in a crucial meeting of Liberty's board of directors on July 13, 1971.

At that meeting all six incumbent members of Liberty's board were present; a seventh seat was vacant. Also present was Fred Beaty, general counsel for Liberty. Katt, representing Equity, was standing by in a separate room.

The four directors constituting the committee to investigate the proposed purchase of Equity recommended it. The proposal, as tentatively agreed upon with Katt, called for payment through the issuance of 501,200 shares of Liberty's stock. After some discussion a lesser offer was conveyed to the waiting Katt, who rejected it. Finally a vote was taken on a motion to authorize the officers to carry out the purchase on the original terms. The vote was three in favor and two opposed. One director, although a member of the recommending committee, abstained from voting.

At the conclusion of the vote the chairman announced that the motion had carried. No one took exception to that announcement. The abstaining director then suggested that Mr. Beaty, the company's counsel, go out and tell Katt that his proposal had been accepted. Before doing so, however, Beaty polled the six members of the board individually to see if there were any objections. All six told him to go ahead.

At this point Beaty ushered in Mr. Katt. He was told in the presence of all directors that the deal was on, and there was a general discussion about their future working relationship (under which, among other things, Katt was to become an employee of Liberty).

There was testimony that Katt was advised at that time of the outcome of the vote, but no suggestion was made that it was insufficient. One of the dissenting directors, Paul Wunsch, indi-

cated that he wanted to see the written contract before it was signed. He gave no indication, however, that he regarded the proposed contract as unauthorized.

Mr. Beaty announced that drafting of the written contract would begin at his office at 10:00 a.m. the next day, and that all interested individuals were welcome to participate. On this note the meeting broke up.

The next day Ford and Beaty, on behalf of Liberty, met with Katt and Equity's counsel to formalize the contract. Drafting consumed some two days, and on July 16, 1971, the contract was formally executed by the officers of each corporation. Mr. Wunsch apparently did not avail himself of the opportunity to participate in the drafting process. There is, however, no evidence that he objected to any provision of the contract as finally drawn, or that any provision he would have suggested was omitted.

Two features of the contract become important in this case. First, pending closing rather severe limitations were put on Equity's right to hire or fire personnel, spend or borrow money, or dispose of property. Second, it was agreed that the contract would be submitted to the Kansas securities commissioner "as provided by Kansas statutes pertaining to exempt transactions." Closing was to take place "at a time not more than fifteen (15) days after completion of the necessary filings and action required by the Statutes of the State of Kansas governing exempt transactions in securities."

Accordingly the contract was submitted to the securities commissioner to secure a ruling from him that the proposed issue of Liberty stock was exempt from the registration requirements of the Kansas securities act. The commissioner conducted a hearing on August 12, 1971, at which Liberty appeared by Fred Beaty, Equity appeared by its counsel, and several individual interveners appeared by counsel. Among the latter was one of the two dissenting Liberty directors, Paul Wunsch, who appeared by his son, attorney Robert Wunsch. There is no indication that any question was raised at that time about the validity of the contract.

At the conclusion of the hearing the commissioner took under advisement the question of whether the proposed issue was exempt as an "isolated transaction" under K.S.A. (then 1970 Supp.) 17-1262 (a). Pending his determination he ordered that no

offer, sale or transfer of Liberty's stock be made. There is some dispute over the distribution of that order: certain of Liberty's directors (including Paul Wunsch) came into possession of it, while neither its counsel nor the chairman of its board of directors saw it until some two weeks later. On the part of Equity, Mr. Katt's testimony was that he was unaware of the order until after it had been superseded by an order granting the exemption on August 26, 1971.

After the August 12 hearing before the securities commissioner Katt began pressing Ford to close the sale. His demands were both formal and informal. Ford, on behalf of Liberty, was willing and eager to close but was unable to deliver any Liberty stock. This was because Mr. Wunsch, as secretary, would not sign the certificates, and had advised the bank which served as Liberty's transfer agent not to transfer any stock. (Mr. Wunsch, according to his testimony, was relying on the securities commissioner's order of August 12.) Ford put Katt off from day to day, hoping to clear matters up within the Liberty circle, but frankly admitted that "it was rather doubtful whether I would be able to get anything done on it in the future."

Other directors of Liberty were concerned about the delay, and sought independent legal advice. Two opinions were rendered in which counsel found the proposed issue was exempt and outside the jurisdiction of the securities commissioner.

On August 26, 1971, the securities commissioner issued his second order, finding the issue was exempt. The same day Liberty's board met, and a heated discussion took place over the accuracy of Mr. Wunsch's minutes of the July 13 meeting. According to his version of the minutes he had made his looking at the contract almost a condition precedent to its execution; Beaty's invitation to interested parties to participate in the drafting was omitted. Katt and Equity thereafter made further efforts to close. On August 30, 1971, Ford wrote Equity's counsel about the latest controversy on the Liberty board, concluding that:

"Under the circumstances, there is no authority to issue stock to Vic Katt and it apparently is going to be the position of some directors that they did not know when the contract was to be prepared and signed and that no authority to sign the contract existed.

"No instructions were furnished to the officers as to any action to be taken concerning the board's vote to accept your proposition, but, as you can see, the authority to issue the stock to you is not available to me."

Katt and Equity were naturally quite distressed at this turn of events, and on the morning of September 2, 1971, Katt appeared at Liberty's offices with counsel and all closing documents. Ford's response was, "I can't close the transaction and I see no way this transaction will ever be closed or can be closed. . . . Every time I try to close it, I have been stopped at the pass."

That afternoon, after consulting counsel, Katt on behalf of Equity wrote to Liberty withdrawing the offer to close, saying the contract was in breach and that Equity would pursue its legal remedies. Katt nevertheless made further efforts to close, but when they were likewise fruitless this suit followed.

The trial court based its judgment for defendant solely on the invalidity of the 3-2-1 vote of Liberty's directors; it failed to reach plaintiff's claims of apparent authority and estoppel, or defendant's claim of anticipatory breach. We find the judgment was erroneous on all grounds.

In the first place we believe the vote was sufficient to authorize the contract. At the common law an abstainer was counted as voting with the majority, or at least as acquiescing in their action. The many cases so holding are collected in the annotation at 63 A. L. R. 3d 1072. The question arises most frequently in the case of public bodies, but in Kansas the same rule applies to private corporations as to municipal corporations. *Smith v. State,* 64 Kan. 730, 733, 68 Pac. 641. A majority of a quorum is all that is required under the common law.

The common law rule may, of course, be altered by statute. We do not believe it has been altered in Kansas. Applicable in 1971, when the Liberty vote was taken, was K.S.A. 17-3101, providing that a majority of the directors should constitute a quorum and that "[t]he act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless a greater number is required by the articles of incorporation, the bylaws, or by provisions of law." In the absence of the statute the act of a majority of those present (if a quorum) would have been the act of the board. The statute does not change this result. We certainly see nothing in the statute indicating an intent to alter the role of an abstainer from acquiescence to opposition—the statute simply does not deal with abstainers. In short, we see nothing more in this statute than a codification of the common law.

In *Smith v. State,* supra, Kansas adopted the generally accepted principle that a member of a governing body who wishes to defeat a proposal must vote against it. There it was held that a resolution carried when four members of an eight-member council voted for it, while other members present abstained. The court quoted with approval from *The Rushville Gas Company v. The City of Rushville et al.,* 121 Ind. 206, 23 N. E. 72, which had held that a resolution was validly passed by the affirmative vote of three members of a six-man council, with three abstainers:

"The mere presence of inactive members does not impair the right of the majority of the quorum to proceed with the business of the body. If members present desire to defeat a measure they must vote against it, for inaction will not accomplish their purpose. Their silence is acquiescence rather than opposition. Their refusal to vote is, in effect, a declaration that they consent that the majority of the quorum may act for the body of which they are members." (*Smith v. State,* supra at 732-33.)

In the case at bar four members of Liberty's board constituted a quorum. There is no doubt that a vote of three to one would have been good, or three to two, under the statute as well as under the common law. Under the rule of *Smith v. State,* the presence of an abstainer does not change this result. He may have been physically "present," but for voting purposes he might as well have been elsewhere.

The one case to the contrary cited to us is *Dillon v. Berg,* 326 F. Supp. 1214 (D. Del. 1971). The trial judge deciding that case found it to be "established" that an abstainer is counted in the negative, citing treatise authority. As previously stated, the general rule throughout the country puts the abstainer with the majority, and our Supreme Court has so held. Accordingly, we hold that the July 13 vote of Liberty's board was sufficient to adopt the resolution authorizing the contract.

But even if the resolution was not properly adopted, so that Ford as Liberty's chief executive officer had no actual authority to sign the contract, it is hard to imagine a clearer case of an agent acting with ostensible or apparent authority. The principles governing such an agency relationship were recently restated in *Brown v. Wichita State University,* 217 Kan. 279, 540 P. 2d 66, Syl. 6-8:

"An ostensible or apparent agent is one whom the principal has intentionally or by want of ordinary care induced and permitted third parties to believe to be his

agent even though no authority, either express or implied, has been conferred upon him."

"Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority."

"Upon acquiring knowledge of his agent's unauthorized act, the principal should promptly repudiate the act; otherwise it will be presumed he has ratified and affirmed the act."

See also, *Theis v. duPont, Glore Forgan Inc.,* 212 Kan. 301, 510 P. 2d 1212, Syl. 6; *Greep v. Bruns,* 160 Kan. 48, 159 P. 2d 803, Syl. 4, 5.

In this case the principal, Liberty, through its board of directors, intentionally led Katt and Equity to believe that Ford had authority to contract. All the conduct of each director at the meeting of July 13 was consistent with such authority—none was even slightly inconsistent. Katt was told by all that he had a deal. It may be that the results of the vote were imparted to Katt; the evidence on that point is conflicting. One thing is clear, however, and that is that no one remotely suggested the proposition had not carried. All were in agreement that it had. If Liberty's directors thought the vote was good, surely an outsider was not duty bound to challenge it. As to Mr. Wunsch's desire to see the final contract, that was purely an internal matter with Liberty and was no concern of Katt's. There appears to us no reason why Katt could not reasonably rely on the assurances of Liberty's directors and proceed to execute the contract.

Further, Liberty's directors knew the contract had been executed when they participated in the securities commissioner's hearing a month later. If the signing was unauthorized they had a duty to "promptly repudiate the act." (*Brown v. Wichita State University,* supra, Syl. 8.) Having failed to do so, it must be presumed that they "ratified and affirmed the act." (*Ibid.*)

Beyond that there is the element of estoppel. In *Maurer v. J. C. Nichols Co.,* 207 Kan. 315, 320, 485 P. 2d 174, the court observed:

"The doctrine of equitable estoppel is said to be based upon the principle that a person is held to a representation made or a position assumed where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances, has in good faith relied thereon. [Citations omitted.]"

Here, for almost two months Liberty led Katt and Equity to believe there was a binding contract. Delays were all blamed on internal dissension, and perhaps on the securities commissioner, but never on a claimed invalidity of the contract. Equity, in

reliance on the contract, secured its directors and stockholders' approval and abided by the contract's restrictions on its activities. The classic elements of an estoppel, or at least quasi-estoppel, were present. See, *Bowen, Administrator v. Lewis,* 198 Kan. 706, 712-13, 426 P. 2d 244, and cases cited therein. In our view Liberty was estopped from denying the validity of the contract.

Liberty, as a second line of defense, urges that even if the contract was good Equity was guilty of an anticipatory breach. The argument is based on the contract provision calling for closing "not more than fifteen (15) days after completion of the necessary filings and action required by the Statutes of the State of Kansas governing exempt transactions in securities." Liberty says that this language gave it fifteen days after the commissioner's exemption order of August 26, 1971, in which to close. Equity's letter of September 2, it claims, was therefore eight days early.

We agree there was an anticipatory breach, but it seems clear to us the breach was Liberty's, not Equity's. The Liberty letter of August 30, quoted above, leaves no doubt in the reader's mind but that Liberty did not intend to perform and that its officers could not perform. The same idea was convincingly conveyed by Ford to Katt personally on September 2, before Katt wrote his letter of that date. Equity's rights at that point are concisely stated in *Whiteley v. O'Dell,* 219 Kan. 314, 317, 548 P. 2d 798:

. "If it is clear that one party to a contract is going to be unable to perform it, the other party need not wait for the date when performance is due. He is entitled to treat the contract at an end and pursue his remedies. (11 Williston on Contracts, sec. 1308, p. 100; 17 Am. Jur. 2d, Contracts, sec. 506, p. 986; *Jinnings v. Amend,* 101 Kan. 130, 165 Pac. 845; *Brady v. Oliver,* 125 Tenn. 595, 147 S. W. 1135 [1911].)"

Applying that reasoning to the case at bar, after Liberty had repeatedly said it would not and could not perform Equity was not required to wait eight more days for a possible change of heart.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.