(630 P.2d 1185)

No. 51,624

MARY DOLORES BACA and SUSAN ROBERTSON GERARD, as individuals and MARY DOLORES BACA and SUSAN ROBERTSON GERARD, as Trustees of the LOUISE V. STOVER TRUST, *Appellants and Cross-Appellees,* v. WALGREEN CO., an Illinois Corporation, *Appellee and Cross-Appellant.*

Opinion filed June 26, 1981.

*James S. Willard* and *Robert D. Hecht,* of Scott, Quinlan & Hecht, of Topeka, for appellants and cross-appellees.

*Robert S. Johnson,* of Russell, Johnson & Johnson, of Topeka, for appellee and cross-appellant.

Before ABBOTT, P.J., SWINEHART and MEYER, JJ.

MEYER, J.: This case involves the question of whether there was a breach, or breaches, of a lease agreement.

Appellants, Mary Dolores Baca and Susan Robertson Gerard, as individuals and as trustees of the Louise V. Stover Trust, who were owners of the property in question (landlords), brought this action alleging that appellee Walgreen Co. (tenant) had breached its lease with the landlords by failing to comply with a demand that the tenant install a dry fire extinguishing system and automatic fuel cut-off device for the cooking appliances. The landlords sought cancellation of the lease and possession. The tenant counterclaimed for damages for constructive eviction and harassment, and also for failure to make certain repairs. The tenant also requested declaratory judgment enjoining landlords

from further harassment, and ordering the landlords to make certain repairs.

The pertinent parts of the lease agreement are as follows:

"2. . . . Landlord shall furnish to the leased premises at all times sufficient sewer, gas, water and electric service lines of sufficient capacity as required by Tenant, which shall be connected to an adequate source of supply or disposal.

. . . .

"4. Tenant shall not use the leased premises for any unlawful'purpose. Tenant shall comply with the valid requirements of public authorities regarding the manner of the conduct of Tenant's business in the leased premises, but as to the leased premises, Landlord shall make all changes or installations so required.

"5. Tenant shall make repairs to the interior of the leased premises and plate glass replacements, except as provided below. Landlord shall maintain and make all repairs to the exterior and structural portions of the building, sidewalks, parking and other common areas, entrances to the leased premises, pipes, ducts, wires and conduits leading to and from the leased premises. Landlord shall make all repairs required by the fault of Landlord or by fire, casualty or the elements, or by dry rot or termites. Landlord shall keep basement free from water but shall not be liable for any damage except upon failure so to do after notice. The provisions of this paragraph shall be complied with as required from time to time. Landlord shall make repairs and replacements to heating and air conditioning equipment costing in excess of $200 in each instance.

. . . .

"9. Tenant may install and operate interior and exterior electric and other signs, soda fountain machinery and any other mechanical equipment, and in so doing shall comply with all lawful requirements. . . .

. . . .

"19. If any rent is due and remains unpaid for ten days after receipt of notice from Landlord, or if Tenant breaches any of the other covenants of this lease and if such other breach continued for thirty days after receipt of notice from Landlord, Landlord shall then, but not until then, have the right to sue for rent, or to terminate this lease or Tenant's right to possession and re-enter said premises, but if Tenant shall pay said rent within said ten days, or in good faith within said thirty days commence to correct such other breach, and diligently proceed therewith, then Tenant shall not be considered in default. . . . If Landlord shall from time to time fail to perform any act or acts required of Landlord by this lease and if such failure continues for thirty days after receipt of notice from Tenant, Tenant shall then have the right, at Tenant's option, to perform such act or acts and the full amount of the cost and expense so incurred shall immediately be owing by Landlord to Tenant, and Tenant shall have the right and is hereby irrevocably authorized and directed to deduct such amount from the rent. No delay on the part of either party in enforcing any of the provisions of this lease shall be considered as a waiver thereof.

. . . .

"28. Supplementing Article 19—

"If by reason of default of Tenant, Landlord shall terminate Tenant's right to possession of the leased premises, Tenant shall nevertheless remain liable to

Landlord for the payment in full and when due of all rent reserved under this lease for that portion of the unexpired term up to the next optional termination date under Article 14. In such event Landlord shall have the right to relet the leased premises, for the account and benefit of Tenant, but until so relet, Tenant shall continue to pay rent to Landlord when due and payable; if the leased premises shall be so relet by Landlord and if a sufficient sum shall not be realized from such reletting to fully pay the rents reserved hereunder, then Tenant shall pay to Landlord monthly, the amount of each such monthly deficiency."

The following facts are as found by the trial court.

The lease was originally entered into between the tenant and George and Bertha Gordon (landlords' predecessors in title) on April 1, 1960. Under an earlier judgment June 13, 1977, the tenant became attorned to the landlords herein under the terms of the lease. (Affirmed on appeal, unpublished opinion No. 50,586, filed March 14, 1980.)

The need for fire extinguishing equipment in the tenant's store first became known to the landlords in April, 1978, as a result of a loss control engineering report prepared by the insurer of the premises. On May 11, 1978, the landlords sent a letter to tenant's central office requesting tenant to make the corrections recommended by the report.

On July 13, 1978, the landlords inquired about progress at the Walgreen store and were informed that nothing had been done in the 815 Kansas Avenue store, although such a system had been installed in the Walgreen store at the White Lakes Shopping Center. The landlords had received notice that the insurance coverage would be cancelled if the cooking surfaces protection problem could not be solved.

On July 17, 1978, the landlords received a letter from the central office of the tenant stating that after reviewing the lease tenant had found no grounds to undertake installation of the fire protection system at its own expense. On the same date, the landlords sent a letter to the tenant entitled, "Demand and notice of further default under those remaining provisions of April 1, 1960, contract which are still operative." The notice demanded that the tenant shut down the operation of the cooking surfaces until a fire extinguishing system could be installed, meeting approval of the insurer of the premises. The notice also stated the tenant was in default by violating its "implicit covenant to operate its business in a safe manner so as to avoid the unnecessary risk of fire in the premises and the imposition on its land-

lords of excessively high costs for fire and other casualty insurance." The notice also stated that tenant must, within thirty days of receipt of the notice, undertake the installation of the fire extinguishing system, refrain from cooking, or warrant that the landlord would be provided fire insurance on their building at a certain rate. If tenant failed to do so, then at the end of the thirty-day period, tenant would have to remove itself from the premises.

The landlords were informed on July 21, 1978, by house counsel for tenant, that tenant would modify the fire extinguishing system.

On July 25, 1978, the tenant contacted Keller Fire & Safety Equipment Company of Kansas City to get an estimate on such a system and said estimate was made and communicated to tenant on July 28, 1978. Tenant sent an order on September 26, 1978, to Keller Fire & Equipment Company indicating that the work should progress. The landlords spoke with an employee at tenant's store on August 18, 1978, and September 7, 1978, regarding progress on installation of the system and were informed nothing yet had been done.

A meltdown of electrical wires occurred on the property in the interior of the building on approximately September 30, 1978. The cause of the problem was an electrical malfunction in the electrical junction box. A leak in the steam pipe under the threshold in the store area and near the junction circuit box of the store caused a short circuit and meltdown in the electrical box, the same having been caused by a foreign substance (rust) in the junction box.

It was discovered on October 3, 1978, that the system ordered from Keller Fire & Equipment Company would not work in the store, since the existing system (which was located in the vents but not over the cooking surfaces) was not the same system as the one proposed to be installed.

On October 3, 1978, the landlords had a telephone conversation with tenant's central office. The landlords were told that the Keller Fire & Equipment Company could not install the dry fire extinguishing equipment, but that E-Kan Inc. Fire Equipment Sales and Service would inspect the premises either that day or the next.

An estimator for E-Kan Inc. went to the store at the request of

the tenant on October 4, 1978. The landlords learned of this on October 5, 1978, after telephoning E-Kan Inc. and speaking with an employee there.

On October 9, 1978, the landlords learned that Kemper Insurance Companies would be sending out a notice of cancellation of insurance effective November 11, 1978, unless the desired fire prevention system was installed.

Landlords heard from E-Kan Inc. on October 10, 1978. E-Kan Inc. stated it was told by tenant's manager that its headquarters wanted nothing done to the surfaces being used for cooking in the back kitchen, but only wanted something done in the front serving line. The landlords then called the Topeka Fire Department concerning fire prevention systems required by law for restaurants.

On October 10, 1978, landlords sent tenant a letter entitled "Supplemental declaration of forfeiture of right of possession under former sublease and notice of additional defaults." Such letter listed additional defaults of failure to repair the steam service line and the maintenance of a severely cluttered eastern one-third of the basement of the premises. Tenant was given thirty (30) days to take corrective action with respect to these conditions. The letter further stated that the landlords reiterated their previous declarations terminating tenant's right to possess the premises and informed tenant that should the owners be able to replace the insurance protection, they would accept tenant as a continuing month-to-month tenant upon the condition that beginning November 1, 1978, tenant would pay the sum of $4,200.00 monthly in advance as rent. The letter further stated that in event such terms were unacceptable, tenant should give written notice within fifteen (15) days so that landlord could take steps to rerent the premises, and that premises should be surrendered by midnight, November 9, 1978.

E-Kan Inc., on October 10, 1978, issued an estimate to the tenant for the cost of installing the automatic fire protection equipment over the cooking appliances and automatic shut-off switch ($1,707.75).

Landlords sent a letter to the State Fire Marshal on October 11, 1978, making a request for inspection and report of the store premises.

On October 12, 1978, the property was inspected by the Deputy

State Fire Marshal and the Topeka Fire Department. The property was found to be in violation of K.S.A. 1978 Supp. 31-133, and K.A.R. 22-13-4, regarding automatic extinguishing systems to be installed over cooking equipment. The following day the inspectors made a report finding problems with emergency lighting, egress, corridor enclosure and smoke doors, and a few other items such as locks, exit signs and debris, poor smoking habits, frayed wiring and loose wiring and plugs, as well as the violation for failure to have an extinguishing system over the cooking equipment and remote pull and automatic fuel shut-off device.

Landlords filed suit on October 19, 1978, against the tenant for breach of lease.

On October 20, 1978, house counsel for tenant told landlords that there were only three manufacturers nationally of dry fire extinguishing systems and there was a long waiting period for delivery of the unit.

Landlords called E-Kan Inc. on October 25, 1978, and were told that it had a dozen units in stock and that there would be no delay in securing the units. E-Kan Inc. had received no order from tenant in response to its estimate.

On November 17, 1978, house counsel for tenant sent three letters to the landlords. The first letter notified landlords of their failure to install a dry fire extinguishing system in the grill area at the store. The second letter notified landlords of their failure to repair and relocate the electrical junction box as required by the local fire code. The third letter notified landlords of their failure to repair and replace the heating system including all steam lines. Tenant gave further notice that in the event landlords failed to take the requested actions within thirty days, tenant would perform the necessary work at the cost and expense of landlords.

On November 20, 1978, landlords sent tenant a letter entitled, "NOTICE OF DEFAULT," and stated:

"THEREFORE, PLEASE TAKE NOTICE THAT OWNERS FIND WAL-GREEN CO. TO BE IN DEFAULT UNDER SAID CONTRACT FOR WAL-GREEN'S FAILURE TO UNDERTAKE AND TO COMPLETE THE REPAIR OF THE SERVICE LINE SUPPLYING STEAM TO THE PREMISES AT 815-817-819 KANSAS AVENUE IN TOPEKA, KANSAS."

Another letter of the same date stated the reasons why landlords were not under obligation to make the repairs requested by tenant

in the letters of November 17, and indicated the repairs would not be made by the landlords.

The electrical junction box was repaired by Peters Electric Company on or about November 30, 1978, at tenant's request and the total charge of $3,943.00 was paid by the tenant. Also on that date, tenant issued a purchase order to E-Kan Inc. for the fire extinguishing system.

Sometime during the first two weeks of December, 1978, the dry fire extinguishing system and automatic fuel/power shut-off were installed.

The trial court concluded that the tenant was obligated under the lease to install, at its own expense, the dry fire extinguishing system and the automatic fuel/power shut-off device. It further concluded that tenant was obligated under the lease to comply with the valid requirements of public authorities regarding the manner in which the tenant conducted its business in the leased premises. Consequently, tenant was required to comply with the findings and requirements of the State Fire Marshal as contained in the report of such agency dated October 13, 1978. However, the court held there was no requirement of compliance until tenant received actual notice of such findings and requirements of the State Fire Marshal.

The court further found the landlord had "failed to sustain the burden of proving that the defendant Walgreen has materially breached the terms of the lease agreement of April 1, 1960, by reason of failure to install such dry fire extinguishing system and automatic fuel/power shut-off device for the following reasons:

"(a) Written notices of default or forfeiture sent by plaintiff to defendant prior to the report of the State Fire Marshal on October 13, 1978, failed to notify defendant of its obligation to install the dry fire extinguishing system and the automatic fuel/power shut-off device as required by Article No. 4 of the lease for the reason that the valid requirements of public authorities had not been established prior to such time.

"(b) Defendant Walgreen was under no obligation to install dry fire extinguishing system and the automatic fuel/power shut-off device merely upon request of plaintiff's insurance company.

"(c) Plaintiffs failed to give written notice to defendant as required by Article 19 of the lease of defendant's breach in failing to comply with the valid requirements of public authorities as required by Article No. 4 of such lease after the official report of the State Fire Marshal on October 13, 1978.

"(d) A good faith dispute existed between plaintiffs and defendant with respect to the obligation of installing the dry fire extinguishing system and the automatic fuel/power shut-off device. Defendant sent a written demand to plaintiffs on November 17, 1978, requesting plaintiffs to install such equipment. Plaintiffs

responded in writing on November 20, 1978, rejecting such demand of defendants. In a relatively short period of time thereafter, defendant installed within the first two weeks of December, 1978, such equipment at its own expense. In view of all the facts and circumstances disclosed by the evidence, the conduct of defendant in installing such equipment was not unreasonable and cannot constitute a material breach of the terms of the lease in question."

As to the electrical junction box, it was determined that such was damaged by fire on September 30, 1978, and landlords were required to make all repairs by reason of such fire and to comply with the valid requirements of public authorities regarding the leased premises as required by Article 4 of the lease. Therefore, tenant was entitled to judgment against the landlords in the sum of $3,943.00 pursuant to Article 19 of the lease.

All other violations were held not to constitute a material breach of the provisions of the lease agreement.

The court also held that the landlords had failed to sustain the burden of proving tenant had breached any covenants implied by law with respect to the lease.

Further, the court held that the tenant had failed to sustain the burden of proving constructive eviction by reason of the conduct of the landlords.

The costs of the action were taxed to the landlords.

The landlords appeal from the judgment that the failure to install the fire extinguishing system was not a material breach, and from the award of $3,943.00 as costs of repair to the electrical junction box.

The tenant cross-appeals from the judgment that it was its obligation to install the fire extinguishing system and from the judgment denying its claim for constructive eviction and punitive damages. The tenant also raises several issues regarding damages for repairs not done by the landlords, which issues were not decided by the trial judge.

Tenant first contends on cross-appeal that the court erred in finding tenant was required by the lease to pay for and install the fire extinguishing system.

We address this issue first, even though raised by cross-appellant, because its resolution affects other issues. The tenant raises this issue asserting it should have been awarded the costs of installing the fire extinguishing system.

Whether the lessee or lessor is bound to make improvements or alterations required by governmental authorities must be deter-

mined on the particular facts and circumstances of each case. *Mid-Continent Life Ins. Co. v. Henry's Inc.,* 214 Kan. 350, 356, 520 P.2d 1319 (1974).

*Mid-Continent* is one of the few Kansas cases on the subject. In *Mid-Continent,* the court was faced with a situation in which the lessee had covenanted to make all repairs for maintenance, and a dispute arose over who was required to repair a wall, such repair being necessitated because the wall did not meet city building code standards. There was no provision dealing with what party was to make improvements required by public authorities or public laws.

The *Mid-Continent* court cited the law as summarized in *Gaddis v. Consolidated Freightways,* 239 Or. 553, 398 P.2d 749 (1965):

" 'We have examined all of the available authority on the subject and conclude, . . . that the criterion applied by the courts is briefly but fully stated in 1 American Law of Property, . . .' (1952, § 3.80 beginning at p. 353.) 'Because the statement is concise we copy it in full:

" ' ". . . If the lessee does not expressly covenant to repair, it would seem clear that he generally should be under no duty to make alterations and repairs required by governmental authority in order to conform the premises to health and safety laws. Any changes likely to be ordered for this purpose would be beyond the scope of the tenant's common law duty to repair, and the expenses of compliance are properly regarded either as capital expenditures or as necessary carrying charges to be paid out of the rent.

" ' "Where the lessee covenants to repair, the question of who should bear the cost of compliance depends upon the nature of the alteration or improvement and the reason for requiring it. If the order involves mere repairs which the lessee would normally be required to make under his covenant, he should bear the cost. *Likewise, the burden is on the lessee where the alteration is required only because of the particular use which he is making of the premises,* although it may be questioned whether even in this case, the courts would place the burden of extensive and lasting improvements on the lessee, except perhaps where the lease is for a long term. At any rate, if the order requires the making of such improvements, so-called 'structural' changes, and they are not required because of the particular use made of the premises by the lessee, the lessor must bear the burden of compliance.' " (pp. 557, 558.)" 214 Kan. at 356. (Emphasis added.)

The court in *Mid-Continent* held:

"Under the facts and circumstances in this case it is held that the trial court did not err in requiring alterations and improvements to an exterior wall in a leased building to be made by the lessor where (1) the improvements were substantial and structural in nature; (2) the improvements will survive the term of the lease between lessor and lessee and thus will inure to the primary benefit of the lessor; (3) *the improvements were not required by or because of any particular use made*

*of the premises by the lessee;* (4) the cost of such improvements were substantial as opposed to nominal; and (5) the event which necessitated the improvement was unusual, extraordinary and unexpected and not within the contemplation of the parties at the time the lease was executed." (Emphasis added.) 214 Kan. 350, Syl. ¶ 3.

There are many cases collected at 22 A.L.R.3d 521 dealing with who, as between landlord and tenant, must bear the expense of alterations or repairs ordered by public authorities. One particular factor discussed therein and applicable to the present case is where the improvement is necessitated by the particular use of the premises.

In *First Nat. Stores v. Yellowstone S. Ctr.,* 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968), the tenant was held responsible for installation of a sprinkler system required by governmental authority. The necessity for the sprinkler system arose primarily because of the manner in which the tenant used its premises. The facts in *First National* are quite similar to the facts of the instant case, although the language of the lease in *First National* is clearer as to the responsibility of the parties than the lease in the instant case. The court held in *First National* that the tenant was required to install the sprinkler system because it was required by a governmental authority as a result of the tenant's specific use of the premises.

Other cases have recognized the general rule that unless the lease states otherwise, where a lasting improvement is necessitated by a change in the law *and not by the tenant's use of the premises,* the tenant is not liable. In *Fontius Shoe Co. v. Indus. Western, Inc.,* 42 Colo. App. 236, 596 P.2d 1209 (1979), the sprinkler system was required by the law in several businesses in a shopping center *regardless of the nature of the business.*

In *Mayfair Merchandise Co. v. Wayne,* 415 F.2d 23 (2nd Cir. 1969), the landlord was held responsible for installation of a sprinkler system necessitated by a change in the law. The *Mayfair* court listed the factors in construing a lease with regard to who should make such repairs:

" 'The intention of the parties will be gathered by considering the lease as a whole; having in mind the length of the term; the rental reserved for the entire term as compared with the cost of the work to be done; *whether the work was caused by the use of the premises by the tenant,* by a change in governmental policy, or by a defect in the premises; the relative benefits of the work to the respective parties to the lease; and what the parties must have had in contempla-

tion when they executed the lease.' " (Emphasis added.) 415 F.2d at 25, citing from Rasch, Landlord and Tenant and Summary Proceedings § 588 (1950).

In the case at bar, it is clear that the installation of the sprinkler system was necessitated by the use of cooking equipment in the store. The language of the lease makes tenant responsible for compliance with orders of public authorities *regarding conduct of the business* in the leased premises and the landlords responsible for changes required by public authorities in the leased premises.

The language of the lease is not clear and, tenant argues, should be construed to mean that the landlords should make all alterations in the leased premises when ordered by public authorities and the sentence dealing with conduct of the business refers to the manner of conducting business, such as not selling alcoholic beverages illegally or maintaining sufficient cleanliness standards, etc.

However, we believe the better view is that since the cooking equipment was installed by the tenant, and since such installation caused the sprinkler system to be required, the tenant should install and pay for same. To hold otherwise would be almost as illogical as making the landlords pay for the cooking equipment itself.

Furthermore, the lease here was prepared by tenant. Since it is a written lease, we have the same opportunity as did the trial court to determine the question of ambiguity. *Snodgrass v. Bloomcamp,* 225 Kan. 65, 587 P.2d 316 (1978). We conclude it is ambiguous.

As the Supreme Court said in *Desbien v. Penokee Farmers Union Cooperative Association,* 220 Kan. 358, 363, 552 P.2d 917 (1976):

"Another rule of construction is that an ambiguous contract will be construed strictly against the party who drew or prepared it and liberally toward the other party."

We conclude the trial court was correct in holding the tenant responsible for the expense of installing the sprinkler system.

Tenant further contends that the court erred in failing to find the doctrines of res judicata and judicial estoppel applicable and in failing to dismiss the landlords' claim.

Tenant asserts the landlords' claim should have been asserted in an earlier case between the parties and is barred by res judicata.

"The salutary rule of *res judicata* forbids a suitor to twice litigate a claim for relief against the same party. The rule is binding, not only as to every question actually presented, considered and decided but also to every question which might have been presented and decided. [Citations omitted.] In Kansas the rule of *res judicata* is not binding and does not apply to a different claim for relief even though it may be between the same parties. [Citations omitted.]" *Hutchinson Nat'l Bank & Trust Co. v. English,* 209 Kan. 127, 130, 495 P.2d 1011 (1972).

The test for determining whether the claims for relief are the same is whether the primary right and duty and delict or wrong is the same in each action. 46 Am. Jur. 2d, Judgments § 406, p. 575.

"[T]he doctrine of *res judicata* prevents the splitting of a single cause of action or claim into two or more suits. The doctrine of *res judicata* requires that all the grounds or theories upon which a cause of action or claim is founded be asserted in one action or they will be barred in any subsequent action." *Parsons Mobile Products, Inc. v. Remmert,* 216 Kan. 138, 140, 531 P.2d 435 (1975).

Tenant alleges that the claim for breach of the lease for failure to install the fire extinguishing system should have been alleged as part of the earlier suit (No. 50,586). That case was filed by the landlords against their former lessee, the Gordons, seeking to enjoin payment by Walgreens to the Gordons and requesting that Walgreens be attorned to the landlords under said lease. Walgreens was a sublessee of the Gordons. Walgreens intervened and filed a motion for declaratory judgment requesting landlords be enjoined from evicting it.

The dispute between Walgreens (tenant herein) and the landlords was decided October 19, 1977, as shown by the court's journal entry. The cause of action in the instant case for breach of the lease for failure to install the fire extinguishing system arose, at the earliest, thirty days after the notice of forfeiture in July, 1978. The tenant relies on the fact that final judgment was not entered in No. 50,586 until October, 1978; however, that judgment related to damages suffered by the landlord from the Gordons' breach. The court, in the earlier case, retained jurisdiction to try that issue only and Walgreens was no longer listed in the heading of that journal entry of judgment as all claims between Walgreens and landlords had been resolved by the October 1977 journal entry, and Walgreens was no longer a party in the later proceedings.

Furthermore, the two lawsuits involved separate claims for relief in that separate wrongs were involved. The dispute be-

tween Walgreens and landlords in the earlier case involved payment of rent, whereas here the dispute is over who is to make repairs.

Res judicata does not apply to different claims for relief. Separate claims for relief need not be joined in one action. Joinder is permissive only. *Parsons Mobile Products, Inc. v. Remmert,* 216 Kan. 138; K.S.A. 60-218.

We next reach the landlords' issues.

Landlords claim that the court erred in ruling there was no material breach of the lease in tenant's failure to install the fire extinguishing system because the tenant had no duty to comply with state fire laws and regulations until notified by the State Fire Marshal.

The trial court ruled that the valid requirements of public authorities had not been established prior to the report of the State Fire Marshal on October 13, 1978. The landlords argue that this was error in that tenant had a duty to comply with state laws and regulations before notified to do so by the State Fire Marshal. We agree.

The regulation violated was K.A.R. 22-13-4, which provides:

"In addition to the provisions of 22-13-3, all facilities maintaining commercial cooking equipment shall have approved automatic extinguishers mounted in the ventilation canopies or directly above such equipment. All equipment must bear the underwriters' laboratories label and be of an approved type extinguishing agent such as $CO_2$ or dry chemical. Before any extinguishing system can be accepted it first must meet the approval of the Kansas state fire marshal; *Provided, however,* The authority having jurisdiction may exempt a facility from the requirements of this section, if, in his opinion, the waiving of this requirement would not present a definite life safety hazard."

K.A.R. 22-13-32 allows facilities in service prior to the effective date of the regulations in Article 13, and not in conformity therewith, to continue in service so long as such facilities are not determined by the State Fire Marshal to constitute a distinct hazard to life or property. See also K.S.A. 1978 Supp. 31-133(*c*).

While this regulation allows the State Fire Marshal to exempt certain facilities from operation of the regulations and allow them to continue to operate, this does not mean that up until such time as inspection occurs, there is no violation. The penalty section of the statute makes clear that there are separate violations contemplated by the act. K.S.A. 1978 (now 1980) Supp. 31-150a(*a*) provides:

"Any person who violates any provision of this act or the act of which this act is amendatory, or who violates any rule or regulation adopted pursuant thereto, or who violates any lawful order issued by the state fire marshal or by any of the persons designated in K.S.A. 1972 Supp. 31-137, shall be guilty of a class B misdemeanor, and each day that the offense continues after receipt of written notice thereof issued by the state fire marshal, or by any other person designated in K.S.A. 1972 Supp. 31-137, shall constitute a separate violation. Notice of any such violation shall be sent by restricted mail, as defined in K.S.A. 1972 Supp. 60-103, but refusal of the addressee to receive such notice shall constitute receipt thereof."

We note there is an infraction upon violation of the regulation, violation of a lawful order issued by the State Fire Marshal, and also a separate violation for each day that the offense continues after written notice of violation has been sent. It is clear that tenant was in violation of the regulation even prior to the issuance of the fire marshal's report.

Since the tenant was at that time in violation of the law, tenant was not complying with the provisions of the lease requiring tenant to comply with the valid requirements of public authorities regarding the manner of the conduct of tenant's business in the leased premises (Article 4), nor was tenant operating mechanical equipment in a manner to comply with all lawful requirements (Article 9).

The fact that tenant did not know it was required by law to install said equipment is no excuse. "It is a legal maxim that everyone is presumed to know the law." *Flott v. Wenger Mixer Manufacturing Co.,* 189 Kan. 80, 88, 367 P.2d 44 (1961).

The trial court's assumption that the valid requirements of public authorities had not been established prior to the report of the State Fire Marshal was, therefore, erroneous.

Landlords next contend that the court erred in ruling there was no material breach of the lease in tenant's failure to install the fire extinguishing system because notice of default was ineffective in that it preceded the fire marshal's report.

As noted above, tenant was in violation of the law prior to said report and consequently the covenants of the lease connected therewith, and therefore, the landlords were authorized to give notice of breach and forfeiture pursuant to Article 19 of the lease.

The notice of forfeiture of July 17, 1978, however, stated an incorrect reason for forfeiture. It notified tenant of a breach of the "implicit covenant to operate its business in a safe manner so as to avoid the unnecessary risk of fire in the premises and the

imposition on its landlords of excessively high costs for fire and other casualty insurance." Under the lease, forfeiture is warranted for breach of specific covenants of the lease only, and not for breach of implied covenants. If, in fact, tenant breached an implied duty to refrain from unnecessarily exposing the premises to an additional fire hazard, the remedy for said breach would be an action in damages, not forfeiture of the lease.

We have found no cases in which the landlord gave notice of forfeiture on the wrong grounds. It is clear that notice of forfeiture is necessary in order to terminate the lease for use of the property for violation of the law.

The Restatement (Second) of Property § 12.5 (1977), comment *e*, provides that a lease is not automatically terminated by use of the leased property for an illegal purpose, adding that in order for a lease to be terminated by a landlord, he must give the tenant a notice in which is stated the date of termination and the *reason* why the remedy of termination is in order.

"In the absence of sufficient specificity to convey notice to the lessee of the precise nature of his delinquency, forfeiture should not be permitted." *Sherwood Med. Industries v. Bldg. Leasing,* 527 S.W.2d 407, 411 (Mo. App. 1975).

We are of the opinion that the notice of July 17, 1978, if standing alone, would be insufficient notice of forfeiture because it specified the wrong breach. Following the notice of July 17, 1978, an additional notice of breach was sent October 10, 1978. This notice of breach merely incorporated the earlier notice so it was not a delineation of the correct reason for the breach, *i.e.,* failure to comply with lawful requirements of public authorities.

However, suit was filed October 19, 1978, and served October 20, 1978. The petition adequately alleged a breach by failure of the tenant to install the fire extinguishing equipment which, by its conduct, failed to comply with the valid requirements of public authorities regarding the manner of the conduct of the tenant's business. The landlords prayed that the lease be declared forfeited.

It was held in *Groendycke v. Ellis,* 205 Kan. 545, 549, 470 P.2d 832 (1970), that the filing and maintenance of an action was notice of default and forfeiture to a tenant in a suit for forfeiture for nonpayment of rent.

"This positive manifestation of intent gave appellees ample opportunity to correct

the default and sufficiently satisfied the notice proviso in the lease (see 51C C.J.S., Landlord & Tenant, § 114 [3])." 205 Kan. at 549.

In the instant case the lease provides that if breach continues for thirty days after the notice of breach, landlords have the right to terminate the lease and reenter said premises. But if tenant in good faith within said thirty days commences to correct such breach and diligently proceeds therewith, then tenant is not considered in default under Article 19 of the lease. The trial court did not reach the issue of whether tenant commenced to correct the breach and diligently proceeded therewith within thirty days from the notice. Thus, we must decide whether efforts made by the tenant, after notice, were diligent.

While, as we have said, the July 17, 1978, and other notices were insufficient in that they failed to state the proper reason for forfeiture, we deem it proper to set out that unquestionably the tenant knew for many months before the inception of this lawsuit the reason why the landlords were complaining. While such fact, standing alone, would not constitute proper notice so as to permit forfeiture, such evidence is entitled to some weight when considering whether the tenant acted with due diligence after the notice was given. As shown by the findings of the trial court, as early as May, 1978, tenant knew that landlords were complaining about tenant's failure to install a proper fire extinguishing system which was necessitated by tenant's cafe business. On July 17, 1978, tenant was notified that its lease was subject to forfeiture, and although the formal part of said notice contained the wrong reason for forfeiture, yet the same notice made known to tenant that landlords were still complaining of the lack of fire extinguishing system. The second written notice of forfeiture further reminded tenant of the landlords' complaint. The commencement of suit on October 20, 1978, disclosed good and sufficient reason for forfeiture. Notwithstanding such long-time actual knowledge, the tenant did not send a purchase order for installation of the required fire extinguishing equipment until November 30, 1978, more than thirty days after it received notice of breach, and over a month and a half after they had received E-Kan Inc.'s estimate of October 10, 1978.

We conclude the tenant did not exercise due diligence in acting promptly after October 20 to effect the installation of the fire extinguishing system.

Landlords also contend the court erred in ruling there was no

material breach of the lease in tenant's failure to install the fire extinguishing system because a good faith dispute over who had the obligation to install the system rendered the alleged breach reasonable and nonmaterial.

We have found no cases and none have been cited by the parties in which a good faith dispute over who is to make a certain repair will allow equitable relief from a forfeiture provision. On the contrary, it was held in *First Nat. Stores v. Yellowstone S. Ctr.*, 21 N.Y.2d 630, that there was no acceptable basis for disallowing a forfeiture even though there was a declaratory judgment action filed by the tenant within the time period required by the lease for compliance. There is no clearer case of a good faith dispute than *First Nat. Stores v. Yellowstone S. Ctr.*, 21 N.Y.2d 630, yet the court held that since the motion for restraining order was not filed until after the termination of the lease, the forfeiture of the lease should have been upheld.

We conclude the trial court's reason in the instant case for finding a nonmaterial breach of the lease was erroneous. The trial court should have ordered the lease forfeited, as there was a material breach of the lease after proper notice of forfeiture.

Landlords claim that the court erred in ruling that it was the landlords' obligation to repair the electrical junction box.

Landlords argue that the cause of the damage to the electrical junction box was the poor condition of the steam service line, and that the tenant was negligent in failing to repair the steam service line and, therefore, caused the damage to the electrical junction box. While the trial court found the damage to the electrical junction box was caused by a leak in the steam service line, there was no evidence that the leak was caused by tenant's negligence.

The lease specifically obligates the landlords to make repairs caused by fire and to comply with the orders of public authorities with regard to the leased premises (not related to the conduct of tenant's business). The Violation Notice of the Building Inspection Department of the city of Topeka indicates the repair of the electrical junction box was repair of *fire* damage. Furthermore, the inspector found that repairs were necessary to comply with the National Electrical Code. This was clearly the responsibility of the landlords under the above-mentioned provisions.

Even though the repair to the electrical junction box was the responsibility of the landlords, tenant failed to comply with the

self-help provision which allows tenant to make the repairs itself and then charge them to the landlords. That provision states that if the landlords fail to perform any act required by the lease, and if the failure continues thirty days after receipt of notice from the tenant, tenant shall then have the right, at its option, to perform the acts and the full amount of the cost shall immediately be owing by landlords to tenant, and tenant can deduct such amount from the rent.

The tenant sent the purchase order for repair to the electrical junction box on November 30, 1978, but had only sent notice to the landlords November 17, 1978. Since this was less than thirty days prior to the date the tenant made the repairs, it did not comply with the requirements of the lease. It is noted, however, that the landlords sent tenant a letter November 20, 1978, which stated that the landlords did not intend to comply with the request of the tenant. This anticipatory breach would allow tenant to make the repairs and charge landlords for the repairs. See *Equity Investors, Inc. v. Ammest Group, Inc.*, 1 Kan. App. 2d 276, 563 P.2d 531, *rev. denied* 225 Kan. 843 (1977).

The last set of issues are those raised by tenant in its cross-appeal.

Tenant contends that the court erred in failing to enjoin the landlords from further harassment during the remainder of the lease.

Landlords were merely pursuing their legal rights in suing and sending letters requesting certain acts be performed by the tenant. We see no reason for enjoining a landlord from pursuing legal rights in order to settle legal disputes. There was no error as to this issue.

Tenant also contends that the court should have awarded it $4,990.00 damages for repairs to the exterior of the building which were the landlords' responsibility.

Tenant claims that it had shown $4,990.00 worth of damages for various repairs which were the responsibility of the landlords, but were not made. Tenant relies on a letter of landlords' attorney, introduced into evidence, which stated certain work was the responsibility of the tenant's former lessor, the Gordons. Since the landlords now stand in the shoes of the Gordons, the tenant argues landlords are responsible for the repairs. In cross-examination of the landlords, it was established that several of the

repairs listed in the letter had still not been completed, namely wall flashing and pitch pockets: $1,390; alley paving: $800; and sidewalk: $1,800. There was testimony that there were also some problems with the roof leaking which had been repaired, but not to the satisfaction of the tenant. Tenant, in its brief, also raises an item in the letter delineated Simer pumps, electrical outlets, anti-pilferage chains, and outlet hoses: $1,000. The landlords testified that the Simer pumps had been replaced. The landlords admitted that these repairs were their responsibility and that the estimates had been made in conjunction with their lawsuit against the former lessors, the Gordons. There were also several letters which indicated requests for these repairs, but no notice was sent that tenant would make repairs and charge these to landlords if landlords did not comply with the request.

On appeal, the landlords claim that there is no showing that the damages for these items were prayed for nor shown to be necessary or reasonable.

Regardless of whether the above items were sufficient to prove the costs of repairs as necessary and reasonable, the law indicates that the damages herein requested were the wrong measure of damages.

In *Miller v. Sullivan,* 77 Kan. 252, 94 Pac. 266 (1908), the measure of damages in breach of a covenant to repair premises by a landlord was discussed. The court cited the general rule:

"[O]n a breach of the covenant by the landlord to make repairs the measure of damages is the difference between the rental value of the premises as they were and what it would have been if they had been put and kept in repair." 77 Kan. at 253.

The *Miller* court went on to discuss other options of the tenant and stated:

"[U]pon the breach of a covenant of the landlord to repair, the tenant may make the repairs and charge the landlord therewith or he may rely upon the covenant and recover all damages flowing from the breach. (*McCoy v. Oldham,* 1 Ind. App. 372, 27 N.E. 647, 50 Am. St. Rep. 208.) In that case the covenant was to clear a part of the land, and the court approved the rule allowing the diminution in rental value as the measure of damages, saying that this is ordinarily the measure of recovery." 77 Kan. at 254.

The *Miller* court held that the tenant could recover for damages to goods in his storeroom where the landlord failed to make repairs to a roof and where the tenant gave seasonable notice to the landlord and the landlord made continual, although ineffec-

tual, efforts to repair. The tenant was thus able to recover the damages naturally and proximately resulting from the breach.

We find no case where a tenant was able to recover the cost of making repairs as the damages, where the tenant had not made the repairs.

Assuming that such costs are not the measure of damages, there is a complete failure of proof as to the damages which tenant sustained by the landlords' failure to make repairs. There was no evidence introduced that any goods were damaged due to the failure to make the repairs, or of any other consequential damages flowing from the breach, nor was there any testimony as to the diminution in rental value from the failure to make repairs. We find no error as to this issue.

Tenant also claims the court should have awarded tenant $1,200 damages for replacement of the underground steam supply pipe.

There was evidence introduced that the tenant incurred $1,200 expense in replacing the underground steam supply pipe. Tenant made the repair after notice to the landlords of violation and after receiving landlords' answer that they would not make the repair. The trial court found that the steam service line was the responsibility of the landlords, but failed to award damages for said repair. We conclude the court should have awarded said damages on the same basis as the award of the damages for repair of the electrical junction box.

The provisions of the lease applicable to determine who was responsible for the repair are as follows:

"2. . . . Landlord shall furnish to the leased premises at all times sufficient sewer, gas, water and electrical service lines of sufficient capacity as required by Tenant . . . .

. . . . .

"5. Tenant shall make repairs to the interior of the leased premises . . . except as provided below. Landlord shall maintain and make all repairs to the exterior and structural portions of the building, sidewalks, parking and other common areas, entrances to the leased premises, pipes, ducts, wires and conduits leading to and from the leased premises. Landlord shall make all repairs required by the fault of Landlord or by fire, casualty or the elements, or by dry rot or termites. . . .

"6. Landlord shall make repairs and replacements to heating and air conditioning *equipment* costing in excess of $200 in each instance." (Emphasis added.)

The trial court specifically found the steam service line was in the interior of the building, but was part of the heating "system"

and therefore, the landlords' responsibility under Article 5. We agree.

Tenant further contends the court erred in ruling tenant had failed to sustain the burden of proving a constructive eviction and harassment, and in failing to award punitive damages therefor.

Tenant claimed constructive eviction, breach of a covenant of quiet enjoyment, and harassment from the repeated efforts of the landlords to gain compliance with fire regulations and numerous notices of default, and the filing of the two lawsuits noted in this case as well as another filed in district court which was dismissed.

The trial court ruled that tenant had failed to sustain the burden of proving a constructive eviction.

"The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed." *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 (1976); *Jennings v. Speaker, Executrix,* 1 Kan. App. 2d 610, Syl. ¶ 8, 571 P.2d 358 (1977).

We affirm the decision of the trial court on this issue.

Finally, tenant contends the court erred in refusing to allow attorney fees and costs.

Landlords were ordered to pay court costs by the trial court. Tenant alleges the court should have awarded it attorney fees and costs, but admits that there was no offer of evidence as to what those fees and costs were. Tenant requests that the case be remanded, so that the trial court can admit evidence as to said fees and costs.

"The general rule is that attorney fees are not allowable as costs in an action in the absence of statutory authority." *In re Miller,* 228 Kan. 606, 610, 620 P.2d 800 (1980).

There is no statute which would allow attorney fees in this type of case, nor has counsel cited any. Further, there is no provision in the lease allowing for the award of attorney fees by agreement. The decision of the trial court is affirmed as to this issue.

Affirmed in part; reversed in part, all as herein set out.

ABBOTT, J., dissenting. I find myself in disagreement with the majority on a number of issues, both as to the law and as to its

application to the facts. Although I am reluctant to accuse my colleagues of reweighing the facts, it is my opinion that in some instances they have done just that and have arrived at different conclusions and have substituted their judgment for that of the trial judge. I do, however, agree with the majority as to the liability of the landlord for the steam line. I would otherwise affirm the trial judge's decision for the reasons stated in his findings of fact and conclusions of law.