No. 44,861

BELDON BOWEN, Administrator c. t. a of the Estate of Marcelline M. Ward, Deceased, *Appellant*, v. NORMAN P. LEWIS and MARGARET L. KEMPER, *Appellees*.

(426 P. 2d 244)

Opinion filed April 8, 1967.

*William J. Walsh,* of Concordia, argued the cause, and *Charles A. Walsh,* of Concordia, was with him on the briefs for appellant.

*Charles W. Harris,* of Wichita, argued the cause, and *Lee R. Sanford,* of Concordia, and *Paul M. Buchanan,* of Wichita, were with him on the briefs for appellees.

The opinion of the court was delivered by

FATZER, J.: The appellant, Beldon Bowen, administrator c. t. a. of the insolvent estate of Marcelline M. Ward, deceased, has appealed from judgments in favor of the appellees, Norman P. Lewis and Margaret L. Kemper, a son and a daughter of the decedent, in the sum of $8,800 each, which was allowed as administrative expense in the administration of the decedent's estate and classified as second class claims pursuant to K. S. A. 59-1301.

The appellees filed identical claims in the probate court in February and March, 1963—over seven years after the administration of the decedent's estate was commenced—and each sought recovery of an undivided one-half interest in a monthly rental of $200 per month for 88 months for the use of hotel furnishings owned by them and used to continue the operation of the Barons Hotel located at Concordia. The claims were transferred to the district court for trial (K. S. A. 59-2402 a and b), and tried to a jury. After all the evidence had been introduced, each party moved for a directed verdict. The district court overruled the motions, and later dis-

charged the jury. It then took the case under advisement and made findings of fact and conclusions of law, and entered judgment allowing the claims in full with interest.

The pertinent facts are summarized: For many years Marcelline M. Ward and her husband owned and operated the Barons Hotel in Concordia. Following the death of her husband, Mrs. Ward desired to retire from the active management of the hotel and go to Chicago and live with her daughter Margaret. On June 21, 1951, she designated her son, Norman, as her agent-manager, at a salary of $60 per week, and conveyed all the furniture, furnishings and personal property in the hotel to Norman and Margaret in equal shares by a deed of gift. When the gift was made, the property was appraised by three persons at $4,897.50. The gift constituted substantially all of the furnishings in the 100-room hotel and the property remained in the hotel as long as it continued in business. As the furnishings deteriorated and became unusable during the lifetime of Mrs. Ward they were replaced at her expense. After her death they were replaced at the expense of her estate. It should be noted that neither Norman nor Margaret made any claim against their mother for the use or rental value of the hotel furnishings during her lifetime.

Norman continued to operate the hotel as Mrs. Ward's agent for approximately four years and until her death on August 10, 1955. In 1953, it became apparent that Mrs. Ward was involved in a controversy with the Internal Revenue Service because of her failure to discharge income tax obligations. The tax difficulty became acute, and tax liens were filed by the government and three suits were commenced in the United States Tax Court by Norman and his mother. This litigation was settled after Mrs. Ward's death and resulted in the filing of a claim in the approximate amount of $93,000, with interest, against the decedent's estate. Other facets of that litigation involving Norman are detailed in *Bowen, Administrator v. Lewis,* 198 Kan. 605, 426 P. 2d 238, this day decided.

Following Mrs. Ward's death, her will was admitted to probate in Cloud County and Norman was named as executor to serve without bond. The will devised the hotel to Norman and Margaret in equal shares and devised other property to another son, Martin Lewis.

On August 20, 1955, Norman qualified as executor of his mother's

estate, and on the same day he petitioned the probate court for authority to continue the operation of the hotel pursuant to K. S. A. 59-1402. The pertinent part of the order granting the authority reads:

"It is, therefore, by the Court considered, ordered, adjudged and decreed that said executor, Norman P. Lewis, be, and he is hereby authorized to continue the hotel business owned by the decedent at the time of her death and known as the Baron't (sic) House in Concordia, Kansas, for a period of six (6) months from the 10th day of August, 1955 [the date of the decedent's death], unless disposition of such business be made pursuant to the order of this Court prior to such time, and that said executor be and he is hereby authorized to do any and all things necessary and essential to the proper operation and conduct of such business, including the hiring of employees to assist in the operation of the hotel, *the payment of all expenses,* including wages, salaries, F. I. C. A. *taxes, withholding taxes, incidental to such business.*

"It is further by the Court considered, ordered, adjudged and decreed that said executor shall keep an accurate and separate account of all receipts and expenditures in connection with the said business and that report thereof be filed with the Court.

"It is further by the Court considered, ordered, adjudged and decreed that the said executor, Norman P. Lewis, be and he is hereby allowed a fee of $60.00 per week for his services in managing such business and he is hereby authorized to pay such amount to himself weekly and to credit himself therefor upon his account."

The authority to continue the operation of the hotel was renewed by the probate court each six months until the hotel was sold in December, 1962—a period of seven years and eight months. Norman's salary of $60 per week was later raised to $120 per week by order of the probate court, and during the time he operated the hotel as manager he received the sum of $41,200 in salary. Financially, the hotel "broke even" during the period it was operated in the administration of the estate. Norman made efforts as executor to compromise the government's income tax claim for $25,000, but his proposal was rejected and it became necessary to sell the hotel since the estate was insolvent.

It was the plan and intention of Norman and Margaret to buy the hotel and keep it in the family. In order to be in a position to bid at a sale of the hotel, Norman resigned as executor on October 1, 1962. In his final report, he made full accounting of expenditures and assets coming into his hands from the date of his last accounting to the probate court. When discharged as executor, he was allowed the sum of $3,500 in addition to partial fee allowances

previously made, and was allowed the sum of $5,000 for his attorneys as costs of administration of the decedent's estate.

On the same day, October 1, 1962, the appellant, Beldon Bowen, was appointed administrator with the will annexed of the estate of the decedent and was required to give bond in the amount of $50,000. As administrator c. t. a. he was authorized to continue the operation of the hotel pursuant to the order of the probate court and until such time as was necessary to liquidate the assets and satisfy the claims and demands allowed against the estate. He was also authorized to hire employees, and a manager, if necessary, to assist in operating the hotel, and pay all expenses, including wages, salaries, F. I. C. A. and withholding taxes incidental to such business until otherwise ordered by the court.

During the middle of December, 1962, the hotel property was sold at public auction and Norman made a bid of $10,000. His bid was insufficient and the property sold for $28,500. In January, 1963, the appellees sold the hotel furnishings given to them in their mother's deed of gift, including the furnishings which were replaced, for approximately $8,000 and the proceeds were divided equally between Norman and Margaret. Had Norman been successful in his effort to purchase the hotel, he and Margaret would not have sold the furnishings.

The statute, K. S. A. 59-1402, authorizing the continuance of the business of a decedent, reads:

"Upon a showing of advantage to the estate the court, with or without notice, may authorize a representative to continue and operate any business of a decedent or ward for the benefit of his estate, under such conditions, restrictions, regulations and requirements, and for such periods of time not exceeding six months for any one period as the court may determine. *No debts incurred or contracts entered into shall involve the estate or the representative beyond the assets used in such business immediately prior to the death of the decedent* or the appointment of a guardian for the estate of the ward." (Emphasis supplied.)

The foregoing was an entirely new section when the probate code was enacted in 1939. The first sentence was lifted bodily from Section 98 of the Minnesota Probate Code. (See, Session Laws of Minnesota, 1935, Ch. 72, § 98), and the second sentence was taken from the Ohio Probate Code. (See, Ohio Probate Code, § 10509-9 [114 Ohio Laws, pp. 320, 402; 116 Ohio Laws, pp. 385, 394, § 1, effective September 2, 1935], Title 21, Page's Ohio Revised Code Annotated, § 2113.30.) In some cases it may be advantageous

to an estate to continue the decedent's business for a limited period in order to obtain the greatest amount in liquidating the business. (Judicial Council, 1939.) The statute is so drawn that as many safeguards against loss are provided as are reasonable. The probate court in which the estate is administered is possessed of the necessary powers and facilities to specifically provide in its order under what conditions and restrictions the business shall be carried on and to require such an accounting as it may determine and to order the business terminated at any time. The statute places no limitation on the rights of testators to direct, in their wills, that their executors carry on the business as they may direct. In the absence of a testamentary authorization to carry on a business, an order of the probate court is necessary to authorize the representative to continue or operate the business. (2 Bartlett's Kansas Probate Law and Practice, rev. ed., § 824.) See, also, *Campbell v. Faxon*, 73 Kan. 675, 85 Pac. 760; 5 LRA, n. s., 1002.

We think the district court erred in not sustaining the appellant's motion for directed verdict. In the first place, a personal representative is limited in incurring obligations which bind the estate (2 Bartlett's, *op. cit., supra*), and he may not incur debts or enter into contracts which involve the estate or himself beyond the assets of the decedent used in such business immediately prior to the decedent's death, without the approval of the probate court first obtained. (*In re Estate of Wolfe*, 190 Kan. 581, 376 P. 2d 825.) In the second place, the furnishings in question were not assets of the decedent's estate, but were owned by Norman and Margaret and they entered into no contract with the decedent during her lifetime to rent the furnishings. In the third place, there were no orders of the probate court specifically directing the executor to pay the rental value, monthly or otherwise, as was made with respect to Norman's weekly salary as manager, and to credit the executor's account with the amounts paid. Assuming, but in no sense deciding, the orders of the court authorizing the executor "to do any and all things necessary and essential to the proper operation and conduct of such business, including . . . the payment of all expenses . . . incidental to such business," were sufficient to include the payment of the rental value of the furnishing, no claims were timely made for such rental during Norman's tenure as executor, nor did he or his sister make claims for such allowance when he was discharged as executor on October 1, 1962. On that date, he made final accounting to the court and asked only for

allowances for his services as executor and those of his attorneys. It is clear the sums allowed were costs of administration, and entitled to priority of payment over claims allowed against the estate and assigned to the fourth class. (K. S. A. 59-1301; *In re Estate of Bertrand,* 188 Kan. 531, 363 P. 2d 412.)

Under the provisions of K. S. A. 59-301, the probate court has the power and original jurisdiction to direct and control official acts of executors and administrators to settle their accounts. The statute here involved (K. S. A. 59-1402) was construed and applied in *In re Estate of Wolfe,* supra, and it was said:

"The foregoing statute cannot be interpreted to mean that the executrix of a decedent's estate can, without an order of the court, make payments for merchandise and bind the estate so that a fourth-class claim can thereby be accelerated into a second-class claim. *Had petitioner desired it could have obtained appropriate orders of the court before continuing transactions with respondent under the circumstances and the duty was upon petitioner to protect itself. . . ."* (l. c. 584, 585.) (Emphasis supplied.)

Those who are creditors, not of the testator, but subsequent to his death, determine whether they will be creditors, and they are required to protect themselves by seeing that appropriate orders of the court are entered before continuing transactions with the personal representative, and take timely action to see that their accounts are paid. (*In re Estate of Wolfe,* supra; 2 Bartlett's *op. cit., supra,* § 825.) And so here. Norman and Margaret, as individuals, had the duty to protect themselves by seeing that orders of the probate court continuing the business permitted the executor to pay the rental value of the furnishings, and they were required to timely make claims therefor. Having failed to do so, may their claims now be allowed? We think not. It would seem the language of the statute bars enforcement of the claims, but we do not rest our decision on this point.

The probate court was charged with the duty of approving or disapproving the hotel operation. In continuing the business for more than seven years the court relied upon Norman's verified accounts as executor. During this time he made regular reports under oath of all receipts and expenses and secured orders of the court continuing the business upon his representations that all expenses were paid. But the claims in question were not included and were not made known until after Norman's discharge as executor and his efforts to purchase the hotel were unsuccessful. Both appellees testified they gave notice to no one, the probate court or otherwise, they intended to ask for rent for the use of the furnish-

ings during the operation of the hotel. May they now claim the orders of the court approving Norman's accounts as executor were meaningless? We think not. To hold otherwise would place a probate court at a great disadvantage in dealing with a fiduciary the court is required to supervise and control. Norman's verified reports as executor necessarily led the probate court to believe the hotel was paying its way as a going concern. Had the court been advised that additional expenses of $2,400 annually had not been paid it might have terminated the operations much sooner. One of the purposes of the statute is to safeguard against loss to the estate, and, generally speaking, a probate court should not continue a business which is operating at a loss. Moreover, a probate court's authorization to continue a business should not operate to the prejudice of the decedent's creditors, and it would seem intolerable to hold that a fiduciary, who regularly makes reports of accounts of operating a business pursuant to the terms and conditions of the court's authorization to continue the business and procures approval of those accounts based upon his representations, should be permitted to pursue a course of conduct entirely inconsistent with those reports and accounts after he resigns his position of trust.

The record clearly demonstrates that, during the operation of the hotel, the appellees intended to make no claim for rent of the furnishings. Months later, after Norman failed to purchase the hotel and the furnishings had been sold, identical claims known only to the appellees and aggregating the sum of $17,600 were brought to light and filed as expenses of operation. It is evident the claims were an afterthought to recover the rental value for the use of their property after their plans to keep the hotel in their family had been thwarted by the tax claim and the purchase of the hotel by a stranger. We are of the opinion the appellees may not now "mend their hold," so to speak, and pursue a course inconsistent with their past conduct in dealing with the estate. Whether their conduct be designated as laches, silence, waiver, or acquiescence, it is not very important, and we think they are barred and estopped to now make claims for rental of the furnishings.

There are certain principles recognized which are analogous to the doctrine of estoppel and which are sometimes described as *quasi*-estoppel. There the conscience of a court is repelled by the assertion of rights inconsistent with a litigant's past conduct. (*Graybar Electric Company v. McClave*, 91 Ariz. 223, 371 P. 2d 350; 3 A. L. R. 3d 750.) The doctrine deals with silence on the part of

those who ought to speak. It deals with conscience on the part of those who know the facts and do not speak. (*Lillard v. Johnson County*, 102 Kan. 822, 172 Pac. 518; *Knox v. Great Lakes Pipe Line Co.*, 135 Kan. 170, 9 P. 2d 650; *Wilson v. Stephenson*, 143 Kan. 91, 53 P. 2d 874.) In *Wilson v. Stephenson*, supra, it was held:

"The present position of the defendant in this action is so inconsistent with that which she maintained for several years as administratrix of the estate of her deceased husband—as shown by the evidence recited in this opinion aside from the facts in the case decided against her—as to justify the holding that in equity and good conscience she was barred and estopped from taking advantage of her own wrong to the detriment of others she formerly represented." (Syl.)

Likewise, in the case of *Bank v. Jesch*, 99 Kan. 797, 163 Pac. 150, it was said:

"The plaintiff contends that by his conduct at this time the defendant was precluded from afterwards denying its claim. The defendant maintains that no estoppel could have resulted, because the plaintiff's position was in no way changed for the worse by reason of anything that had been said. In order for the conversation narrated to operate as a bar to a subsequent denial of the plaintiff's interest it is not necessary that there should have been a concurrence of all the elements of an estoppel, as the term is usually defined. 'Whether the principle is described as equitable estoppel, *quasi*-estoppel, waiver, ratification, election, or as a requirement of consistency in conduct, is not very important.' (*Powers v. Scharling*, 76 Kan. 855, 859, 92 Pac. 1099.) 'The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced.' (10 R. C. L. 694.) . . ." (l. c. 799, 800.)

See, also, *Nogrady v. Fourth National Bank*, 136 Kan. 43, 12 P. 2d 787; *Schiffelbein v. Sisters of Charity of Leavenworth*, 190 Kan. 278, 374 P. 2d 42, and *Star Leasing Corp. v. Elliott*, 194 Kan. 206, 398 P. 2d 566. In the *Schiffelbein* case, supra, attention was directed to 19 Am. Jur., *Estoppel*, Sec. 62, p. 678, where it was said:

" '. . . Estoppel by acquiescence is, obviously, closely related on the one hand to estoppel by consent and, on the other hand, to estoppel by silence or inaction, or by delay. In fact it is often impossible to distinguish clearly between such estoppels, and the courts in many instances use the term "acquiescence" as covering or including all the others. "Acquiescence," as the term is here used, however, refers to an implied consent and need not involve anything in the nature of a positive affirmation; and while, as has already been pointed out, silence or inaction may, under some circumstances, amount to acquiescence, it does so only where the circumstances are such as to afford some ground for believing that acquiescence was intended. . . .' " (l. c. 282.)

The jurisdiction of the probate court to approve and confirm Norman's reports and accounts as executor reflecting expenses necessarily incurred in operating the hotel, is beyond question. If the orders of the court were wrong, he must suffer the consequences of having procured them. Margaret was aware of the facts heretofore set forth and by her implied consent, silence or inaction, she acquiesced in Norman's failure to include the rental for the furnishings in his reports to the probate court. By her silence and inaction she made it possible for the probate court to continue the business when the hotel's financial position would have been clearly altered had she timely filed her claim. As indicated, whether the appellees' conduct be designated as laches, silence, waiver or acquiescence, we hold they are estopped to change their position and disrupt the orders and decisions of the probate court in the administration of the decedent's estate, and their claims are unenforceable.

The judgment is reversed with directions to the district court to dismiss the appellees' claims. It is so ordered.