657 So.2d 1337 (1995)
Roy A. BREAUD, Sr., Clifford C. Comeaux, Sr., F.A. Graugnard, Jr., A.C. Hymel, Willis J. Poirrier, Jr., Donald G. Veron, Sr., and Maurice Bienvenu, Jr.
v.
Valfred J. AMATO, Paul G. Aucoin, Riley F. Boudreaux, Henry A. Smith, Jr., Marion J. Steib and Van J. Zeringue.
No. 94-CA-1054.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 1995.
Rehearing Denied August 17, 1995.
*1338 Harry Rosenberg, Mary Ellen Roy, Robert S. Eitel, Phelps Dunbar, New Orleans, Alan J. Robert, Gonzales, for plaintiffs, appellees.
Paul E. Bullington, Jeanne P. Breckinridge, Kathy Manchester Borbas, Scott A. O'Connor, Gordon, Arata, McCollam & Duplantis, New Orleans, for defendant, appellant Van J. Zeringue.
Paul G. Aucoin, Vacherie, for defendants, appellants Paul G. Aucoin and Riley Boudreaux.
Thomas J. Kliebert, Jr., Michael K. Heltz, Yvette M. Bergeron, Kliebert and Heltz, Gramercy, for defendants, appellants Henry A. Smith, Jr., Valfred J. Amato and Marion J. Steib.
Before BOWES, GAUDIN and GOTHARD, JJ.
GOTHARD, Judge.
This is an appeal of a preliminary injunction granted in favor of the plaintiffs. For the following reasons, we affirm and remand.
*1339 The July 13, 1994 preliminary injunction prevents defendants from holding a meeting of the shareholders of St. James Bancorporation, Inc. (a bank holding company that holds all of the stock of St. James Bank & Trust Co.) unless the shareholders are permitted to decide what voting rights the "control shares" (shares recently acquired by the defendants and others) have, if any. Defendants have appealed, arguing four assignments of error: 1) The Change in Bank Control Act preempts application of the Louisiana Control Share Acquisition Act to St. James Bank and St. James Bancorporation, Inc.; 2) The district court misapplied the Louisiana Control Share Acquisition Act by not requiring plaintiffs to show that the owners of the alleged control shares vested a "person" with "the power to direct the exercise of voting power" with respect to the alleged control shares; 3) The trial court improperly issued a preliminary injunction against six individual directors of St. James Bank & Trust Co. and St. James Bancorporation, Inc. based upon a contested application of the Louisiana Control Share Acquisition Act to other shareholders and in the absence of allegations against the defendant directors of fraud or breach of fiduciary duty; and 4) The trial court erred in granting a preliminary injunction against the defendants without a showing by the plaintiffs that they would suffer irreparable harm if the injunction were not granted. Plaintiffs have answered the appeal, arguing that the district court erred in failing to enjoin Van Zeringue from sitting on the board of directors of the Holding Company.
As a matter of law, a preliminary injunction is an interlocutory procedural device designed to preserve the existing status quo pending a trial of the issues on the merits of the case. To obtain a preliminary injunction, the moving party must show that the damage it will suffer may be irreparable if the injunction does not issue and that it is entitled to the relief sought. The moving party need only make a prima facie showing that it will prevail on the merits. The preliminary injunction requires less proof than is required in an ordinary proceeding for permanent injunction and the trial court has great discretion to grant or deny a preliminary injunction. See Foret v. Terrebone, Ltd., 631 So.2d 103 (La.App. 5th Cir.1994); Franz v. Cormier, 579 So.2d 1201 (La.App 5th Cir.1991); and the cases cited therein. Irreparable injury means the moving party cannot be adequately compensated in money damages for its injury, or suffers injuries which cannot be measured by pecuniary standards. Franz, supra. (citations omitted).
After a thorough review of the record before us, we find that there is nothing in the record, statutes or jurisprudence to show that (1) the Louisiana Control Share Acquisition Act[1] is preempted by federal law; and (2) the Louisiana Control Share Acquisition Act cannot be applied to a group. Furthermore, allegations of fraud or breach of fiduciary duty are not necessary to trigger the Louisiana Control Share Acquisition Act. See LSA-R.S. 12:135, et seq. Finally, the trial court issued extensive, well reasoned, and factually and legally sound Reasons for Judgment, which address all pertinent issues and which we adopt and attach as Exhibit "A."
Accordingly, the trial court's July 13, 1994 Order, granting a preliminary injunction in favor of plaintiffs and enjoining defendants from holding a meeting of the shareholders of St. James Bancorporation, Inc., unless the shareholders are permitted to decide what voting rights the "control shares" have, if any, is hereby affirmed. The trial court's denial of plaintiff's request for an injunction to enjoin defendant, Van Zeringue, from sitting on the company's board of directors is also affirmed. The matter is remanded to the trial court for further proceedings.
AFFIRMED; REMANDED.

EXHIBIT A
In this action, plaintiffs, Roy A. Breaud, Sr., Clifford C. Comeaux, Sr., F.A. Graugnard, *1340 Jr., A.C. Hymel, Willis J. Poirrier, Jr., Donald G. Veron, Sr., and Maurice Bienvenu, Jr., seek preliminary injunctive relief so the Louisiana Control Share Acquisition Act, La.R.S. 12:135 et seq. (the "Act") will not be circumvented. Plaintiffs request injunctive relief concerning the annual shareholder's meeting of the St. James Bancorporation, Inc. scheduled for Wednesday, July 13, 1994. After hearing two days of testimony, reviewing the evidence and law, the Court renders judgment in favor of plaintiffs and grants their application for preliminary injunctive relief.

I. FACTS

The Court heard evidence during the preliminary injunction hearing that occurred on July 11th and 12th, 1994. As the result of the evidence presented during this hearing, the Court was presented with a wealth of facts. These facts, coupled with the law, require preliminary injunctive relief.
Although the chronology is brief, a lot of events occurred. In the spring of 1993, defendant Henry Smith was a former member of the Board of Directors of St. James Bancorporation, Inc. (the "Holding Company"), which owns all of the stock of St. James Bank & Trust Company (the "St. James Bank"). Desiring to regain his seat on the Board and wishing to take control of the Holding Company and the St. James Bank, Smith collaborated with his friends, Edward F. "Buddy" Butler, President of the First National Bank of St. Bernard, and Leon Greenblatt, III. Smith and Butler serve together on the Board of Directors of the St. Bernard Bank. Butler and Greenblatt are lifetime friends and business associates. Butler chose to include Leon Greenblatt's son, Chip Greenblatt, a wealthy Chicago securities trader; Smith's diary reveals that Butler approached Chip Greenblatt no later than May 5, 1993 (Plaintiffs' Exh. 1). Smith testified that he spoke to Chip Greenblatt the next day and Chip Greenblatt agreed to invest $3 to $4 Million Dollars to acquire stock in the Holding Company.
The evidence further showed that Chip Greenblatt, together with his business partners Andrew Jahelka and Richard Nichols, are the only principals in a Chicago securities trading firm, Scattered Corporation ("Scattered"). In May and June, 1993, Chip Greenblatt, Jahelka and Nichols were in the process of making $27 million dollars in a series of questionable stock transactions involving LTV Corporation, a bankrupt steel company. The evidence revealed that Leon Greenblatt previously served as a board member of Republic Bank and its holding company in California. As the result of illegal activities and breaches of fiduciary duty that resulted in losses to the depositors, the FDIC prohibited Leon Greenblatt from engaging in any bank activity. (Plaintiffs' Exh. 4).
Greenblatt, Jahelka and Nichols provided large sums for these stock acquisitions made by Smith. The purchases by this group alone amounted to 24.7% of the stock and triggered the Control Share Act. It is uncontroverted that Scattered (three Chicago partners) paid Smith extremely well for his activities: Smith received approximately $100,000 from the Chicago firm, Scattered Corp., and he directed these payments to Aquatic Towing, a company owned by his sons.
Commencing in May, 1993, Smith developed a network of contacts for purchasing shares in the Holding Company with money from the Chicago partners. Smith's procedures were almost always the same. First, Smith would negotiate a price for the stock with a prospective seller. After establishing a price, a member of the group sent funds to the St. Bernard Bank. Once the St. Bernard Bank received the funds, Butler personally would transfer the funds to the First National Bank of Jefferson ("FNJ"). Then Smith or Butler would request FNJ to issue a cashier's check for the amount negotiated, and Smith would deliver the cashier's check to each seller of stock. After the seller received the funds, the stock would be endorsed in blank and given to Smith, who eventually would bring the stock to the St. *1341 James Bank and re-register the shares in the name of its new ownerusually months after the stock was actually purchased. The procedure was virtually the same for each purchase. Smith testified he bought stock from 40 to 50 different shareholders. It is also significant that Smith, Butler and Leon Greenblatt met frequently, where bank matters were discussed.
In the summer of 1993, Smith followed this procedure on numerous occasions. He purchased stock at prices ranging from $36 to $55 per share. Smith did not re-register the shares until September 23, 1993. On September 23rd, Smith arranged for more than 35,000 shares to be registered. Other stock purchased by Smith on behalf of the Smith Group was not registered until December, 1993, when Smith registered another block of more than 37,000 shares.
On June 14, 1993, the Board of Directors of the Holding Company held a special meeting at which defendants Boudreaux, Amato, Aucoin and Steib were present and participating. The purpose of the meeting was to discuss concerns about Henry Smith buying shares of stock of the Holding Company. Boudreaux admitted that he told the Board that Smith had "indicated that he was not the purchaser of these shares but soliciting these shares on behalf of a group."
The $3 to $4 million dollars committed by Scattered would have been sufficient to acquire absolute control of the Holding Company if the price per share had stayed at $36 per share. But the price went up. Shortly after the Board of the Holding Company became aware of Smith's efforts, the Board engaged the services of an investment banking firm to evaluate the worth of the Holding Company stock. The investment banking firm estimated the Holding Company's stock was worth $75 to $85 per share and reported its analysis to the Board on September 23, 1993. Although Smith was able to continue to purchase shares from some shareholders at prices far below this value, he could not persuade other shareholders to do so.
Thus, Smith, Greenblatt, Butler and their colleagues needed an infusion of cash from additional people. Smith visited again with Butler. Butler put Smith in contact with Vallerie Dauterive, Darlene Levy, Isabella Delahoussaye, Raymond Willhoft, and Sidney Torres, III. Dauterive, Delahoussaye and Willhoft all serve on the Board of the St. Bernard Bank with Smith and Butler. Torres is the attorney for St. Bernard Bank and a long-time friend of Butler. Levy also is a friend of Butler's and Torres'. Smith testified he met with these individuals at dinner in a private room at Antoine's Restaurant in New Orleans, on April 11, 1994.
Although the testimony of Butler and Torres conflicted about the April 11th meeting, they agreed that the St. Bernard associates funded the next major purchases of bank stock. Torres promptly established an escrow account for Willhoft, Dauterive, and Delahoussaye to deposit their cash; Torres served as agent. Willhoft deposited $500,000, Dauterive sent $250,000, and Delahoussaye wired $250,000. Chip Greenblatt then made an unsecured loan to Torres, whom he never met, for $250,000 so that Torres could join in this collaborative effort. At the same time, Chip made a second unsecured loan of $500,000 so Butler could participate. Butler and Torres then issued a check in the sum of $1,248,390 to pay for stock owned by Erkle Rodrigue, his wife, Shirley Rodrigue, and his company, M. Rodrigue & Son, and the Lawrence "Pete" Hymel family. Within three weeks, Levy and Butler purchased stock from the Nobile family, members of the Lawrence Hymel family and Hymel's corporation, H. Construction & Supply, Construction Maintenance Company, and Uncle Sam Planting Company. The purchase price for the stock ranged from $55 to $97, which Smith negotiated on behalf of the St. Bernard faction.
During the spring of 1994, defendant Boudreaux, acting in his position as Chairman of the Board, participated in various meetings regarding the intention of the Smith Group. Mr. Boudreaux's notes on these meetings and his trial testimony indicate that he was *1342 concerned about the Smith Group's purchases. He met with Greenblatt to discuss the Smith Group's purchases. He met with Greenblatt to discuss the Smith Group's intentions and he believed, at one point, that the Smith Group had acquired a block of at least 1/3 of the stock of the Holding Company.
During this period, the Smith Group, with the assistance of defendants, sought to make changes at the Bank. They succeeded. They had already persuaded the Board of Directors to vote in favor of allowing Smith to rejoin the Board; he had done so on September 8, 1993. Within a few days of his reinstatement, Smith registered openly for the first time more than 35,000 shares in the names of the Scattered principals, Chip Greenblatt, Jahelka and Nichols. By that time, defendants Valfred Amato and Marion J. Steib had agreed to sell their stock to Smith. Amato sold over 5,000 shares for a total of $265,050 and Steib sold 2,000 shares for a total of $108,000. Defendants Steib and Amato had decided to join the Smith Group because Smith effected the sale of their stock and assured them they would remain on the Board of Directors.
After April of 1994, defendants and others continued to make management and policy changes preferred by Smith. Smith sought and obtained the resignation of long-time St. James President and adversary, Bob Zeringue. Smith selected Van Zeringue to serve as acting President of the Bank.
Defendants continued to assist the Smith Group. At the most recent meeting of the Board on June 8, 1994, defendants voted to reduce the size of the board and to call a shareholders' meeting for July 13, 1994, and to replace the board with a slate handpicked by Smith. The defendants also voted to hire Smith's attorney as the Bank's new attorney. The Board also defeated a motion to require the Board to follow the Louisiana Control Share Acquisition Act for the July 13, 1994 shareholders' meeting. Smith and the rest of the defendant directors refused to adhere to the Act, evidently feeling the Act had not been triggered. Shortly thereafter, plaintiffs filed their verified petition for declaratory and injunctive relief.

II. LAW

The State Legislature enacted the Control Share Acquisition Act, La.R.S. 12:135-140.2, to the Business Corporation Law to protect shareholders' interests. Under this Act, a group acquires "control shares" whenever it acquires shares that would bring its voting power in the corporation to or above any of three thresholds: twenty percent (20%), thirty-three and one-third percent (331/3%), or fifty percent (50%).
It is rare for the members of a group to reduce to writing their plans. Consequently, a group's existence may be shown through circumstantial evidence. Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir.1982), cert. denied, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); Securities and Exchange Commission v. Savoy Industries, 587 F.2d 1149, 1163 (D.C.Cir.1978); Securities and Exchange Commission v. Drexel Burnham Lambert, Inc., 837 F.Supp. 587, 607 (S.D.N.Y.1993); Twin Fair, Inc. v. Reger, 394 F.Supp. 156, 160 (W.D.N.Y.1975). A group, such as the Smith Group, gains voting rights only to the extent granted by a resolution approved by the disinterested shareholders of the corporation. Plaintiffs have made a prima facie showing that the formation of the Smith Group has triggered the Control Share Act. That is all that is required for preliminary injunctive relief. Picard v. Choplin, 306 So.2d 918, 919 (La.App. 3d Cir. 1975); Kenner v. New Orleans Aviation Board, 603 So.2d 220, 223 (La.App. 5th Cir.), writ denied, 604 So.2d 1314 (La.1992).
Under the Control Share Act, the Legislature has decided that a group gains voting rights only to the extent granted by a resolution approved by the disinterested shareholders of the company. La.R.S. 12:140.
The Louisiana Control Share Act's purpose is to protect shareholders of Louisiana corporations. By the Act, our State's Legislature provided the shareholders with the statutory *1343 mechanism to decide whether the change that would result in the control of the corporation would be desirable.
The Control Share Acquisition Act applies to any Louisiana corporation that has (a) at least one hundred (100) shareholders, (b) its principal place of business in Louisiana, and (c) at least ten percent (10%) of its shareholders residing in Louisiana. La.R.S. 12:135(4). The Act applies to the Holding Company because it has over two hundred and fifty (250) shareholders, its principal place of business is Lutcher, Louisiana, and over ten percent (10%) of its shareholders reside in Louisiana. The Holding Company is an issuing public corporation.
In the area of corporate and state securities laws, "courts may look to the federal law jurisprudence interpreting the securities law for guidance in interpreting the Louisiana provisions." Taylor v. First Jersey Securities, Inc., 533 So.2d 1383, 1385 (La.App. 4th Cir.1988), writs denied, 538 So.2d 593, 594 (La.1989). A similar statute in the federal securities laws exists to assist the Court in determining whether the Smith Group acted as a "group" for purposes of the Act. Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. subsection 78 et seq. See, Atlantis Group, Inc. v. Alizac Partners, 1991 W.L. 319384, 7 (W.D.Mich. August 27, 1991).
The jurisprudence holds that a "group" for purposes of Section 13(d) may exist without a written agreement. Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir.1981), cert. denied, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). Accord: Securities & Exchange Commission v. Savoy Industries, Inc., 587 F.2d 1149, 1163 (D.C.Cir.1977), cert. denied, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979).
This Court may determine whether a group exists based on the circumstantial evidence. Securities & Exchange Commission v. Savoy Industries, 587 F.2d at 1163. Especially in a case such as this one, where the members of the group are sophisticated business people, one cannot expect to hear testimony of express agreements or understandings from the group members themselves. Plaintiffs proved by circumstantial evidence and direct evidence the inference of an informal understanding between the members of the Smith Group.
An important characteristic of "group" activity is the use of a single individual to buy the stock. Twin Fair, Inc. v. Reger, 394 F.Supp. at 160. See also, Jewelcor, Inc. v. Pearlman, 397 F.Supp. 221, 250 (S.D.N.Y.1975). In this case, Smith was the one person responsible for the purchase of all Holding Company stock.
Whether the members of the group purchased their stock during a relatively brief and essentially concurrent time period is also relevant. Champion Parts Rebuilders, Inc. v. Cormier Corp., 661 F.Supp. 825 (N.D.Ill. 1987); International Banknote Co., Inc. v. Muller, 713 F.Supp. 612, 619 (S.D.N.Y.1989); General Aircraft Corporation v. Lampert, 556 F.2d 90, 92 (1st Cir.1977); Securities & Exchange Commission v. First City Financial Corp., Ltd., 890 F.2d 1215, 1218 (D.C.Cir.1989). Commencing in early May, 1993, and continuing through the summer of 1993, Smith purchased on behalf of the Chicago members 60,770 shares of nearly 25% of the Holding Company. Smith registered these newly purchased shares on three primary dates in September and December 1993. The Smith Group's St. Bernard Parish membersButler, Torres, Delahoussaye, Levy, Willhoft, and Dauterivepurchased 22,732 shares (or 9.25%) of the Holding Company after Smith had entered into binding agreements with the shareholders. These shares were registered in their names on two single days, May 27, 1994 and June 2, 1994.
Another indicia of the existence of a "group" relates to representations and insinuations to third parties by members of the group that its members together "control" a block of shares, even though those shares are on the record of the company as owned by individual group members. Wellman, 682 F.2d at 363; Jewelcor, 397 F.Supp. at 250. The testimony revealed that Smith claimed *1344 that he and his fellow "group" members controlled a majority of the stock of the Holding Company. Defendants' actions speak loudly: Smith (i) negotiated the termination of Robert Zeringue as the Bank's CEO in May, 1994, (ii) installed Van Zeringue as the Bank's new president, (iii) hired Smith's own law firm to replace the Bank's long-time law firm, (iv) voted to turn down a lucrative merger proposal with Hibernia National Bank, and (v) accepted a new slate of directors for a reduced board drafted by Smith.
Yet another indicator of the existence of a group is action taken by the group to affect the corporate direction of the company. Savoy Industries, supra. The testimony and documentary evidence showed that once the Smith Group had obtained control of one third of the Holding Company's shares, it rejected a lucrative offer to purchase the Holding Company.
The Louisiana Control Share Acquisition Act is triggered when a person or a group of persons acquires over twenty percent (20%) of the stock of an issuing public corporation such as the Holding Company. There is overwhelming evidence that has occurred here. The Chicago members of the Smith Group alone possess nearly 25 percent of the Holding Company. The St. Bernard Parish members of the Smith Group own an additional 10.06% stock. In short, more than 34.80% of the Holding Company has changed hands. Plaintiffs have proved that the Act has been triggered by a "group" of shareholders.
Turning now to the plaintiffs' request for an injunction enjoining defendant Van J. Zeringue from sitting on the Company's Board of Directors, the evidence presented at the hearing shows that twelve directors were present at the directors' meeting when Zeringue's appointment to the Board was considered to fill a vacancy left by the retirement of Robert Zeringue. Of the twelve directors present, six voted in favor of Van Zeringue's appointment as director, four voted against, and two abstained. The plaintiffs have not introduced evidence to establish a prima facie case that this vote was insufficient under the bylaws of the Company or the law to validly seat Van Zeringue on the Board. Under Section 3.2 of the Company's bylaws, when a director resigns, "[t]he remaining directors, even though not constituting a quorum, may, by a majority vote, fill any vacancy." Section 5.6 of the Company's bylaws provides that "[i]f a quorum is present when the meeting is convened, the directors present may continue to do business, taking action by vote of majority of a quorum..., notwithstanding ... the refusal of any director present to vote." A quorum of the board of directors was present at the meeting when the vote of Van Zeringue's appointment was taken. A quorum consists of a majority of the board of directors; in the case of the Company, seven of the thirteen directors. The motion passed by a majority of the directors present and voting, and it also passed by a majority of a quorum. The failure of a director to vote is acquiescence rather than opposition. Equity Investors, Inc. v. Ammest Group, 1 Kan.App.2d 276, 563 P.2d 531, 535-36 (1977) (interpreting Kansas statute similar to Louisiana's, providing that act of majority of directors present and voting a meeting at which quorum is present is act of board). Accordingly, plaintiffs have not shown their entitlement to an injunction preventing Van Zeringue from serving as a director of the Company.

III. CONCLUSION

Based upon the Court's factual findings and legal conclusions, the Court grants Plaintiffs' application for a preliminary injunction because the Control Share Act was triggered when Leon Greenblatt, III, Andrew Jahelka, Richard Nichols, Donald Hayden, Edward Butler, Vallerie Dauterive, Darlene Levy, Isabella Delahoussaye, Raymond Willhoft and Sidney Torres, III acquired control shares of stock without complying with the provisions of the Louisiana Control Share Act, La.R.S. 12:135 et seq. These same shareholders and all six defendants, own "interested *1345 shares" for purposes of La.R.S. 12:135 et seq. Plaintiffs' request for injunctive relief enjoining defendant, Van J. Zeringue, from sitting on the Company's Board of Directors is denied. Plaintiffs are directed to submit to the court an order in accordance with the reasons expressed herein.
Convent, Louisiana, this 13th day of July, 1994.
 /s/ Alvin Turner, Jr.
 HONORABLE ALVIN
 TURNER, JR.
 DISTRICT JUDGE.
NOTES
[1] LSA-R.S. 12:135, et seq.